Filed 3/4/15  In re Anika C. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| In re ANIKA C., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>ANIKA C.,<br><br>        Appellant. | F069527<br><br>(Super. Ct. No. 13CEJ300154-1)<br><br>**OPINION** |

---

**THE COURT**<sup>*</sup>

APPEAL from an order of the Superior Court of Fresno County.  Brian Arax, Judge.

M. Elizabeth Handy, under appointment by the Court of Appeal, for Appellant.

Daniel C. Cederborg, County Counsel, and Amy K. Cobb, Deputy County Counsel, for Plaintiff and Respondent.

---

<sup>*</sup> Before Gomes, Acting P.J., Kane, J. and Franson, J.

-ooOoo-

Two-year-old Anika C., the daughter of Jose C. (father) and S.C. (mother), appeals from the juvenile court's order selecting guardianship as her permanent plan. Anika contends the juvenile court erred when it determined it would be detrimental to her to terminate father's parental rights pursuant to the beneficial parent-child relationship exception set forth in Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i),[1] and consequently erred in selecting a permanent plan of guardianship rather than of adoption. We reverse and direct the juvenile court to vacate its finding that the exception of section 366.26, subdivision (c)(1)(B)(i) applied, and to enter a new order terminating parental rights and designating adoption as the permanent plan.

## FACTUAL AND PROCEDURAL BACKGROUND

The family came to the attention of the San Diego County Department of Children and Family Services (the agency) in October 2012, when mother was in the hospital after giving birth to Anika. During mother's hospital stay, mother and father argued, father refused to hand Anika to mother, and he kicked mother on the leg. When interviewed by hospital staff, mother disclosed a history of domestic violence between her and father, which included father hitting her in the face and leaving bruises, and hitting, pushing and punching her when she was pregnant with Anika. Anika's four-year-old half-sister, K.C.,[2] said she had observed domestic violence between mother and father at home. The agency filed a dependency petition alleging Anika and K. came within the provisions of section 300, subdivision (b), based on their exposure to their parents' domestic violence and mental illnesses. Mother had been diagnosed with major depressive disorder and had

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Mother identified K.C.'s father as G.T. G., who the agency located in Oregon, wanted to reunify with K., who he had not seen since she was three years old. K. eventually was placed with G. and her case was dismissed.

2.

attempted suicide a few months before, while father had Post Traumatic Stress Disorder (PTSD).

Father told a social worker during an interview in October 2012 that he had served in the United States Navy and received an honorable discharge in May 2011. He participated in the Iraq war as a medical corpsman and, as a result, suffers from PTSD. His symptoms included anxiety, insomnia and depression. He had nightmares where he sometimes would awake "physically fighting" in bed as if someone were attacking him; he accidentally hit mother during one of these episodes. His nightmares had not recurred since he began taking psychotropic medications in 2011. He was under the care of a psychiatrist, but was not participating in individual therapy. Father denied having any mood swings or anger issues due to PTSD.

Father had an outstanding warrant for his arrest for misdemeanor driving under the influence. He denied any current drug or alcohol use, and said the warrant may have issued because he failed to complete the required DUI program. In addition to his DUI, father was involved in physical fights with other people when he was in high school, and when he was 19 years old, he went to jail for perpetrating domestic violence on his mother after she accused him of using drugs. As a result of this, he completed a domestic violence program. He denied that domestic violence occurred at the hospital or that he kicked mother; instead, he claimed he accidentally touched mother's leg as he stepped over wires. He also denied any other incidents of domestic violence between them. He admitted there were incidents of domestic violence in his previous relationship with his wife, Savanna P., from whom he was separated but to whom he was still married. Father was unemployed, but was receiving disability benefits. Mother also denied any domestic violence between herself and father, either at the hospital or in the past.

Anika and K. were placed together in a foster home. Mother and father, however, wanted Anika placed with the paternal grandmother (grandmother) in Fresno. Even though she lived five hours away, the parents believed weekly visitation could be worked

3.

out. The agency assessed grandmother, but did not recommend placing the children with her since the distance made weekly visitation likely to be difficult or unrealistic, she had a recent criminal history that included a DUI in 2008 and conviction for grand theft in 2009, she denied knowing domestic violence existed in father's relationship with mother even though the parents reported mother lived with grandmother during a break the parents took from each other in the past due to an argument, and she denied knowing that father had a history of aggression.

Mother and father were having separate, twice-weekly, supervised visits with Anika and K., and three telephonic visits per week.

In a later interview, grandmother admitted to the social worker that father had a history of aggression and anger issues. When father was living with her while in his early 20's, he came home drunk and pushed her during an argument. She called police, father was arrested, and he was ordered to complete an anger management program. While she saw an improvement in him after he completed the program, she described father as being "hot-headed," that he would get "easily angered," and would yell when he became angry. Grandmother admitted mother stayed with her for two days toward the end of her pregnancy with Anika; grandmother did not know it was because of arguments mother had with father. Grandmother was willing to have the children placed with her in Fresno. After this interview, the social worker remained concerned about placing the children with grandmother, but stated the agency was willing to revisit the issue should the parents move to Fresno.

In January 2013, the San Diego juvenile court found the petition's allegations true and set a contested disposition hearing. Thereafter, the agency approved grandmother's home for placement after exemptions were processed due to grandmother's criminal history and Fresno County child welfare services conducted a home evaluation. Father was attending individual therapy, but continued to deny domestic violence with mother. Although he missed his first intake appointment, he was attending the domestic violence

4.

treatment program. Mother admitted to the social worker that father kicked her on the leg during the argument at the hospital, that they often argued, and during arguments they hit each other. Father continued to deny domestic violence and told the social worker he accidentally kicked mother's leg. Neither parent was willing to separate from the other. They did not have plans to move to Fresno due to financial difficulties.

By the March 8, 2013 dispositional hearing, the agency recommended that Anika be placed in grandmother's care, the parents be offered reunification services, and visitation remain supervised. At the hearing, the San Diego juvenile court declared Anika a dependent, removed her from parental custody, placed her in grandmother's home, and ordered reunification services for mother and father. Mother and father waived visitation issues that might arise due to Anika being placed in Fresno.

On May 13, 2013, the parents moved to Fresno and referrals were made for services in the area. On May 21, 2013, the San Diego juvenile court ordered Anika's case transferred to Fresno County, which the Fresno juvenile court accepted on June 12, 2013. The Fresno juvenile court gave the parents supervised visitation, which the Fresno County Department of Social Services (Department) had discretion to change to unsupervised, liberal, extended visits.

On July 3, 2013, the social worker prepared an addendum report as to the parent's current status with services. Father successfully completed a parenting class in January 2013. The social worker scheduled a substance evaluation for father, as he had not completed one. Father's last drug test was on February 1, 2013, which was negative. The social worker referred father for random drug testing. Father completed 14 of 52 weeks of a batterer's treatment program, had missed the maximum allowed days without being excused, completed only one out of ten of the requirement assignments, and had not processed a safety plan. Father's therapist in San Diego reported that father's progress was poor, as he continued to deny or minimize domestic violence. The social worker initiated a referral for therapy in Fresno.

The parents were participating in third party visits with grandmother. During a visit on June 5, 2013, grandmother had to intervene in a verbal altercation the parents had in front of Anika. Grandmother had not reported any other such incidents, but told the social worker she would no longer supervise visits if the parents continued to display inappropriate behavior. The parents did not have a set visitation schedule. When they first moved to Fresno, they visited Anika every day, but as of July 2013, they were visiting all day, two to three times per week.

A six-month review hearing ultimately was held on October 18, 2013. In a report prepared for the hearing, the social worker stated that on July 26, 2013, grandmother reported that the parents continued to argue in Anika's presence during visits and grandmother would no longer allow the parents to visit together. Grandmother was very flexible with the parents and would make herself available each week for visits. The parents were visiting two to three times per week; visits lasted up to eight hours. Anika recognized her parents and referred to them as "mama and da da." Grandmother's only concern during visits was the parents' inability to refrain from arguing in front of Anika. Grandmother was concerned about how the parents were with each other when they were alone. The social worker reported that father had regularly and consistently visited Anika. According to grandmother, father and Anika had a reciprocal, loving relationship.

Father participated in a substance abuse evaluation, which resulted in a recommendation to participate in a substance abuse education class due to his history with drinking. During this assessment, father stated that he did not have anger or rage issues until recently, which he attributed to PTSD and a potential traumatic brain injury. He claimed he was never a physically violent or destructive person, and explained that his past physical confrontations were isolated, peer induced, incidents. He also claimed his domestic violence offense that became physical was an isolated incident, and the majority of his confrontations with mother were verbal. Father provided negative drug tests in June and July.

6.

Father also completed a mental health assessment. According to the evaluator, father presented with sadness, worry, fear, problems falling asleep, nightmares, flashbacks of explosions he was exposed to in Iraq, panic attacks, reduced activities and difficulty concentrating. Father told the evaluator he was seeing a psychiatrist at the Veteran Administration Hospital (VA) in Fresno, and would be connecting with a therapist for individual therapy. The evaluator recommended father participate in individual treatment at the VA. Although father had participated in a domestic violence assessment, the results had not been received. Father told the social worker he continued to need help dealing with his PTSD, and that he wanted to obtain any other help needed to reunify with Anika.

While the Department initially recommended continuation of reunification services, that recommendation changed after mother and father were involved in a domestic violence altercation on August 23, 2013, in which mother reported sustaining multiple injuries to her face and head, and needed stitches on her chin. Mother left father after that incident and they were no longer together. According to the Fresno police incident report, father punched mother on her left ear with a closed fist. Mother fell to the ground and started screaming so someone would hear her. When she got up and tried to leave the room, he locked the door and began punching her face and head with a closed fist. Mother again fell to the ground. Father held mother down with her hand while he punched her ten to fifty times. A male friend came in and tried to pull father off her, but father charged her and kicked her in the face. He then went to the kitchen, came back with a pair of scissors, grabbed her clothes and started cutting them. After another male friend knocked the scissors out of father's hand, father grabbed a large red lighter and, when mother walked out, he punched her on the chin with the lighter's metal frame. The male friends grabbed father and took him outside. Father ran and a felony warrant was requested.

The social worker opined this incident demonstrated that the parents had failed to ameliorate the conditions that led to Anika's removal and had not made significant progress toward doing so. While mother had demonstrated the capacity and ability to complete the objectives of her treatment program, she was not able to apply the tools she gained from services in order to keep Anika safe. Father had not demonstrated the capacity and ability to complete the objectives of his treatment plan.

At the six-month review hearing, the juvenile court terminated reunification services for both parents and set a section 366.26 hearing.

On January 30, 2014, the social worker prepared a section 366.26 WIC report recommending termination of parental rights and adoption as 15-month-old Anika's permanent plan. Anika remained in grandmother's care. She was healthy and had no major behavioral issues or mental health needs. She had formed a healthy parent-child attachment with grandmother, and was assessed as adoptable.

Mother last visited Anika on July 26, 2013; since then, mother had not contacted the Department or grandmother to ask about Anika's well-being or to request visits. Father had twice-weekly supervised visits, which took place on weekends. The social worker had not been able to supervise any visits to determine father's ability to provide structure, challenge, engagement and nurture for Anika. According to grandmother, Anika enjoyed the visits, she always became excited when she saw father, and she enjoyed playing with him. The visits reportedly went well and father was always on time. Father also would call grandmother to ask how Anika was doing. The social worker opined that while father had maintained ongoing and consistent contact with Anika, he had not established a parent/child relationship with her or met her daily needs since her birth, and Anika's relationship with father was that of a friendly visitor with whom she played during visits.

Grandmother was noted to display excellent parenting toward Anika. Grandmother loved Anika and was committed to a plan of adoption. Grandmother told

8.

the social worker she was in a good position in life to dedicate all of her time and attention to raising Anika, and wanted to continue providing Anika with a safe, loving, and stable home environment. Grandmother understood adoption was a lifelong commitment, which she was willing to make. Anika was bonding to grandmother, who had been the only stable parental figure in Anika's life. Father told grandmother that it would be in Anika's best interest if grandmother adopted Anika and provided her with the stability he was unable to provide.

Father called grandmother as a witness at the April 14, 2014 contested section 366.26 hearing. Grandmother confirmed she had been taking care of Anika since Anika was five months old. Grandmother's daughter lived with grandmother and Anika, and watched Anika when grandmother was not watching her. Father had been visiting Anika ever since he moved to Fresno. At first, he visited Anika twice a week, but in the past few months he had been visiting her every day of the week. Over the past few months, father had proven to grandmother that he could be a wonderful father. She described him as a "very nice, honest, [and] beautiful person." She thought he was a wonderful father because he played with Anika, bathed her, and fed her. Grandmother could see the love father had for Anika; he had bonded with her so much and Anika loved him "to death." When father would leave, Anika would cry "Dada, Dada." Grandmother would tell Anika that it was okay and that "Dada is coming back to see you tomorrow." Grandmother confirmed that father had been doing "[e]verything" for Anika, and that the two had been forming a very special bond for about three months.

When asked if she still desired to adopt Anika given her glowing description of father's bond with Anika, grandmother responded that she hoped adoption could be put off for a year to give father the opportunity to prove to the court and everyone concerned that he could be a good dad and do what the court required. However, if she was told that the court could not put the matter off for a year, grandmother would adopt. When the

juvenile court asked if she would opt for guardianship if she were given that option, grandmother responded, "Yes."

The juvenile court went off the record and, upon return, stated that the Department was going to reassess Anika's permanent plan and "in all likelihood" it would be guardianship. The court found good cause to continue the hearing and ordered the Department to reassess the permanent plan and prepare a report for that purpose.

The hearing resumed on April 28, 2014. The Department decided not to submit another report that recommended guardianship, and instead continued to recommend adoption, as grandmother was willing to adopt. Therefore, the Department submitted on its original report. The court continued the hearing as father's counsel was ill.

The hearing continued on May 19, 2014. Father was satisfied with the state of the evidence. The Department cross-examined grandmother. Before Anika was placed in her care, grandmother visited Anika, who she called "my baby," every two weeks while Anika was in foster care in San Diego. At first Anika tried to call her "momma," but Anika now called her "grandma" because grandmother had shown her pictures of father and mother together and told Anika that they were "daddy" and "mommy." Grandmother had Anika in her care for over a year and was the person who provided her with daily parental care in the role of a mother.

Grandmother admitted she was willing and able to adopt Anika, and the Department had cleared her home for adoption. Grandmother agreed that she had testified at the last hearing that she personally preferred guardianship. When asked if she still had that preference, she answered that while she wanted to give her son the opportunity to still be Anika's dad, he needed to work on himself first and needed help to be a good dad. Grandmother did not feel that father was ready to take full custody of Anika. If she adopted Anika, she would not change her approach or attitude about letting Anika know who her biological parents are. Grandmother has told father that if she adopted Anika, he would still see her and would always be in her life. Grandmother

10.

wanted them to have a relationship, adding that father had been "so good to her and they have bonded so much." Anika loved father and she cried when he would leave, saying "dada, dada." Father also hated to leave Anika, but he knew she was in good hands.

On cross-examination by Anika's attorney, grandmother was asked what type of help her son needed. Grandmother responded that he has a lot of anger and other issues. For example, the previous Saturday father went to see Anika and wanted to take her somewhere. Grandmother told him she could not let him take her; father asked "why not," since he is her dad, he had been there, and he was good to her. Grandmother told him Anika was her responsibility and could not go anywhere if she was not with her. Father got "kind of very angry" with grandmother, told her "you're not my mother" and said "I hate you and stuff like that." Father had not talked to grandmother since. Grandmother knew he did not mean it, but it was not right and maybe he needed to take care of his anger. Grandmother did not know why father was angry. In the past, father had told grandmother it was all her fault and that she was trying to take Anika from him. Grandmother tried to explain to him that it was not her fault Anika was taken from him, as she was not there. Grandmother was trying to protect Anika, give her a home and keep her safe, but she could not seem to get that through his mind. Father thought she was a bad person because she wanted Anika with her, and she could not explain to father how it made her feel for him to blame her.

Grandmother was not exactly sure what was going through father's mind. When he returned from Iraq, he was very depressed. She was not aware of any specific disorder father might have that would explain his behavior, but she knew he needed help and she wanted someone to help him.

Grandmother wanted to adopt Anika because she was afraid that mother might come forward in a few years and try to take Anika away from her if she were Anika's legal guardian. She also wanted to protect Anika from domestic violence between father and mother.

11.

On re-direct by father's counsel, grandmother testified that when father leaves the house, he tells Anika he is going to go now, and Anika says "dada, dada, dada." Anika looks forward to father coming back. The minute Anika sees father, she extends her arms out and says "dada, dada, dada." When Anika gets hurt, she runs to father if he is in the home. If Anika is happy and wants to show someone something, she sometimes will take that to the person closest to her, but most of the time she runs to "dada" and wants him. When father is there, he feeds Anika. He asks if she is hungry. He will see what is in the refrigerator, or take her to the pantry and open the door – Anika will point to the macaroni and cheese, and father will cook it for her.

Father tries to discipline Anika when she needs it, but she gets away with things more with him than with grandmother. Grandmother tries to explain to Anika why something is prohibited, but father thinks she does not understand because she is too little. One time when father was washing Anika's hands in the sink by the kitchen, Anika tried to grab a knife. Father told her no, that was a knife, and little babies do not play with knives. Now when Anika sees a knife, she says "dada say no knives."

Grandmother would be satisfied with guardianship if there were no issue concerning mother coming and taking Anika, because she knew her son could be a very good father. She really would rather be a grandmother than Anika's legal parent because she is "grandma[,]" but on the other hand, father would always be Anika's dad, and it was not like she was going to take Anika away from him. They could both raise her.

County counsel asked grandmother whether she was the one who encouraged Anika to have a relationship with father; grandmother responded, "In a way." Grandmother also had talked to Anika about not getting ahold of knives in the home and taught her that when something is hot, you can get burned. Grandmother was protecting Anika like a mother when she told Anika not to do something.

Father did not testify. The parties accepted the Department's offer of proof that if the social worker were called as a witness, she would testify that grandmother's testimony would not change the Department's recommendation of adoption.

After hearing arguments, the juvenile court announced its ruling from the bench. First, it stated it was disappointed that the Department did not provide the supplemental briefing it requested, and made no attempt to assess father's connection to Anika, his progress in services, or any concerns about his mental health or stability. The juvenile court found by clear and convincing evidence that Anika was generally and specifically adoptable, and that grandmother was both willing and able to adopt.

The juvenile court, however, found that the beneficial parent-child relationship exception to adoption applied. In reviewing the applicable standards of this exception, the juvenile court found that father and Anika had been together, and there was "crystal clear" evidence of a "significant positive emotional attachment from child to parent," as Anika looked to father as a father, both to celebrate and to follow his instructions. The juvenile court was unable to find that father's situation presented unique jurisdictional facts or lack of progress in services that were significant enough to say that his relationship with Anika would not be beneficial to her. Moreover, father did not fail to participate in services; instead, his progress was last known to be moderate, but not significant. The juvenile court did not believe father's problems, which included mental health and anger issues, were profound enough to find that his relationship with Anika would not be beneficial, and believed termination of parental rights would greatly harm Anika under the standard articulated in *In re Autumn H.* (1994) 27 Cal.App.4th 567 (*Autumn H.*). The juvenile court noted that neither section 366.26 nor *Autumn H.* required proof that the child had a primary attachment to the parent; instead, the primary attachment may be with the grandmother along with a strong, positive, emotional attachment with father, and the "child would be greatly harmed because of these unique facts."

Accordingly, the juvenile court found by clear and convincing evidence that it was likely Anika would be adopted, but "by substantial evidence[,] either preponderance or even a clear and convincing evidence standard[,] it would be detrimental to the child to terminate parental rights due to interference with the parent/child relationship for father/daughter thus adoption is not the appropriate plan. Legal guardianship is the appropriate plan." The juvenile court appointed grandmother as Anika's legal guardian and terminated dependency. The juvenile court ordered visitation for father at a minimum of twice per week for a total of four hours, supervised by grandmother, with discretion to allow unsupervised visitation four to eight hours at a time. Grandmother, however, was not given discretion for liberal visitation. Visits between mother and Anika were suspended based upon there being no beneficial relationship.

## DISCUSSION

When the juvenile court finds a minor is likely to be adopted, it is generally required to terminate parental rights and order the minor to be placed for adoption. (§ 366.26, subd. (c)(1).) If the court finds by clear and convincing evidence that the minor is adoptable, it becomes the parent's burden to show that termination of parental rights would be detrimental to the minor because of a specific statutory exception to termination of parental rights and adoption. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 574.)

The finding of a beneficial parent-child relationship is one of the statutory exceptions to adoption. (§ 366.26, subd. (c)(1)(B)(i).) Specifically, section 366.26, subdivision (c)(1)(B)(i), states: "[T]he court shall terminate parental rights unless . . . [¶] (B) The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

14.

The Courts of Appeal have considered the beneficial parent-child relationship exception in numerous cases. In *Autumn H.,* the court explained the "[i]nteraction between natural parent and child will always confer some incidental benefit to the child." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Therefore, more is required, and the exception applies only when the relationship with a natural parent "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Id.* at p. 575.) In making this determination, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

The court in *In re Beatrice M.* agreed with *Autumn H.*, holding that the parents' "frequent and loving contact" with their children was not enough to establish the necessary benefit from continuing the relationship, when the parents "had not occupied a parental role in relation to them at any time during their lives." (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.) Another court explained that the beneficial parent-child concept described in *Autumn H.* can be stated as follows: "a relationship characteristically arising from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship. A strong and beneficial parent-child relationship might exist such that termination of parental rights would be detrimental to the child, particularly in the case of an older child, despite a lack of day-to-day contact and interaction." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51 (*Casey D.*).)

The same court that decided *Casey D.* subsequently characterized the nature of the determination required to apply the beneficial relationship exception in an even more

15.

flexible way: "The balancing of competing considerations must be performed on a case-by-case basis and take into account many variables, including the age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs.  [Citation.]  When the benefits from a stable and permanent home provided by adoption outweigh the benefits from a continued parent/child relationship, the court should order adoption." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 811.)  As the court observed in *In re Jasmine D.,* "[p]arent-child relationships do not necessarily conform to a particular pattern.  The juvenile court should be concerned not with finding a certain type of parental relationship but with the interests of the particular child or children before it, and whether there is a compelling reason not to terminate parental rights." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 (*Jasmine D*).)

Here, the juvenile court found Anika adoptable, but determined that termination of father's parental rights would be detrimental to her in that: it was "crystal clear" that Anika had a significant, positive, emotional attachment to father; Anika looked to father as a parent; the jurisdictional facts, father's lack of progress in services, and his unresolved anger issues were not significant enough to say that a relationship with father would not benefit Anika; and termination of father's rights would greatly harm Anika.  Accordingly, the juvenile court selected legal guardianship rather than adoption as the permanent plan.

Anika contends the juvenile court erred in applying the beneficial parent-child relationship exception because the evidence was insufficient to support the juvenile court's finding that she would benefit from continuing the relationship.  She argues the juvenile court mistakenly applied the exception language to encompass a parent/child relationship that was qualitatively insufficient to support any reasonable conclusion that terminating parental rights would result in significant detriment to her.  She further argues father failed to satisfy his burden of proving the exception, as he did not present

any factual evidence to show a primary parental attachment that outweighed Anika's compelling interest in the most secure home possible. She claims that instead the evidence showed, at most, the affectionate relationship of a playmate or extended relative. Finally, she contends the circumstances failed to support any extraordinary reason to deprive Anika of the stability of adoption.

Anika recognizes that there is a split of authority concerning the standard of review in this context. (See *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315 (*Bailey J.*) and *In re K.P.* (2012) 203 Cal.App.4th 614, 621–622 [hybrid combination of substantial evidence and abuse of discretion standards; applying substantial evidence test to determination of the existence of a beneficial parental or sibling relationship and the abuse of discretion test to issue of whether that relationship constitutes a compelling reason for determining that termination would be detrimental to the child]; *Autumn H.*, *supra*, 27 Cal.App.4th at p. 576 [substantial evidence test—"On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order"]; *Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351 [abuse of discretion test].) The Department asserts the appropriate standard of review is abuse of discretion, while Anika asserts that under either standard of review, the juvenile court's findings were erroneous.

We agree that the differences between the two standards of review are insignificant in this case, as they both give deference to the juvenile court's judgment. (See *Jasmine D., supra,* 78 Cal.App.4th at p. 1351.) "'[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did.' . . .""" (*Id.* at p. 1351.)

17.

Once the court found Anika adoptable, it was father's burden to show termination of parental rights would be detrimental to her under the beneficial relationship exception. It is undisputed that father maintained regular visitation and contact with Anika. The issue before the juvenile court was whether Anika would benefit from continuing her relationship with father and, if so, whether there was a compelling reason for determining that termination would be detrimental to her. The evidence upon which the juvenile court relied to find in father's favor on these issues was grandmother's testimony. As the background summary above shows, grandmother alone had the opportunity to observe father with Anika after Anika was placed with her in March 2013, as the Department never observed visits.

Anika contends there was insufficient evidence of benefit to her, as father did not stand in a parental role. The evidence father presented through grandmother's testimony showed that father played with, bathed and fed Anika; Anika would run to him if she hurt herself; most of the time when Anika wanted to show an adult something, she would share it with father; father tried to discipline Anika when she needed it; and father protected Anika from harm, as shown by the knife incident. From this evidence, the juvenile court found that father's relationship with Anika was parental rather than merely friendly or familiar, and therefore Anika would benefit from continuing that relationship.

We assume the evidence was sufficient to establish that father had a parental relationship with Anika. The analysis, however, does not end there. As explained in *Autumn H.*, the juvenile court must balance the parent-child relationship against the benefits Anika would gain from the permanence of adoption; the preference for adoption is overcome if severing that relationship would deprive Anika of a substantial positive emotional attachment such that she would greatly harmed. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

On this issue, while the evidence showed that Anika shared a positive emotional attachment to father, there was no evidence that she would be greatly harmed if she were

deprived of that attachment. At the time of the juvenile court's decision, Anika was 19 months old and had never lived with father. While father regularly visited Anika, he had never moved beyond supervised visitation. For most of the case, grandmother had been providing for Anika's daily needs. It was only during the three months before the section 366.26 hearing that father began forming a bond with Anika; during that time, father had proven to grandmother that he could be a wonderful father and he had taken care of Anika's needs during his daily visits. Grandmother testified that Anika loved father "to death[,]" she looked forward to father's visits, and she would cry "dada" when he left.

At best, this evidence supports the conclusion that Anika loved father, enjoyed his visits, and was sad when they ended. Father, however, did not present any evidence that Anika would be greatly harmed if her relationship with him were severed. There was no testimony about whether Anika missed father or asked for him when he was not there. While Anika cried "dada" when father left, there was no evidence that she remained upset or sad for any length of time afterwards. Father did not present a bonding study that might have revealed the extent of their bond and whether Anika would be harmed if that bond were severed. (See, e.g., *In re J.C.* (2014) 226 Cal.App.4th 503, 533-534 [mother failed to demonstrate harm would ensue from termination of parental rights where the record showed that the child easily separated from mother at the conclusion of visits and readily returned to the caretaker's home, and there was no bonding study or evidence to counter the social worker's conclusion that the child would not suffer any detriment].)

"[I]f an adoptable child will not suffer great detriment by terminating parental rights, the court must select adoption as the permanen[t] plan." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229.) An example of sufficient evidence of detriment is found in *In re Jerome D.* (2000) 84 Cal.App.4th 1200, where the appellate court concluded the juvenile court erred in failing to find the beneficial parent-child relationship exception applied when the nearly nine-year-old son had lived with his mother for the first six and

19.

one-half years of his life, he "seemed lonely, sad, and . . . 'the odd child out'" in his placement, he wanted to live with his mother, he enjoyed unsupervised night visits in her home, and a psychologist opined the son and his mother "shared a 'strong and well[-]developed' parent-child relationship and a 'close attachment' approaching a primary bond." (*Id.* at pp. 1206-1207.) Similarly, in *In re Amber M.* (2002) 103 Cal.App.4th 681, the appellate court reversed termination of parental rights, finding the exception applied, where a psychologist, therapists, and the court-appointed special advocate all concluded a beneficial parental relationship clearly outweighed the benefit of adoption, the two older children had a strong primary bond with their mother, and the younger child was strongly attached to her. (*Id.* at pp. 690-691.)

Here, father did not demonstrate harm would ensue from termination of parental rights similar to that demonstrated in these cases. Evidence of great detriment was missing in this case and the juvenile court could not reasonably conclude, on the record before it, that Anika would suffer great detriment if father's parental rights were terminated.

The Department, the only respondent in this case, urges us to affirm the juvenile court's order. The Department generally argues that because it appears the juvenile court considered the evidence before it and found it weighed in favor of a finding that father's relationship with Anika was a beneficial one, we must give its decision utmost credence and uphold it. But the Department provides no analysis of how the juvenile court reasonably could have concluded on this record that there was a compelling reason to find termination of parental rights would be detrimental.

In sum, we conclude the juvenile court abused its discretion in determining that the beneficial parent-child relationship exception of section 366.26, subdivision (c)(1)(B)(i), applied in this case, as there is insufficient evidence to support the determination.

## DISPOSITION

20.

The order designating guardianship as the permanent plan is reversed.  The juvenile court is directed to vacate its finding that the beneficial parent-child relationship exception to termination of parental rights and adoption of section 366.26, subdivision (c)(1)(B)(i) applied and to enter a new order terminating parental rights and designating adoption as the permanent plan.  The orders appointing grandmother Anika's guardian and issuing letters of guardianship are void.